IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MARY A. LEE,                                     Case No. 6:13-cv-00809-SB

          Plaintiff,                        **FINDINGS AND**
                                                **RECOMMENDATION**

   v.

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

         Defendant.

_____

BECKERMAN, Magistrate Judge.

     Mary Lee ("Lee") appeals the Commissioner of Social Security's ("Commissioner") final

decision denying her applications for Social Security disability insurance benefits and Supplemental

Security Income under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-434, 1381-

1383f. The Court has jurisdiction to hear this appeal pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

For the reasons explained below, the Court recommends that the district court affirm the

Commissioner's decision.

Page 1 - FINDINGS AND RECOMMENDATION

## I. FACTS AND PROCEDURAL HISTORY

Lee was forty-eight years old at the alleged onset date of her disability in November 2007. She alleged disability due to depression, post-traumatic stress disorder ("PTSD"), personality disorder, type II insulin-dependent diabetes, asthma, and obesity. Lee obtained an associate degree in general studies from Northwest Christian College in 2003, and last worked as a certified nursing assistant ("CNA") for PeaceHealth Medical Group in April 2009. Her prior work experience also included time as a fast-food manager, deli worker, and parking lot attendant.

On February 1, 2007, roughly nine months prior to the alleged onset of disability, Lee presented for a mental health intake evaluation at Volunteers in Medicine Clinic in Eugene, Oregon. Dr. Peter Schur's ("Dr. Schur") diagnostic impressions included: depressive disorder not otherwise specified,[1] rule out an adjustment disorder with mixed features of depression and anxiety, and possible premenstrual symptoms and/or perimenopausal symptoms (Axis I); diabetes and asthma (Axis III); family and financial stressors (Axis IV); and a Global Assessment of Functioning ("GAF") score of 65.[2] Lee indicated that she was relieved when Dr. Schur declined to refer her to a psychiatrist for a medication consultation.

---

[1] "When several core features of a particular diagnosis present themselves, but individual characteristics do not give rise to any one subcategory, a description of 'NOS,' meaning 'Not Otherwise Specified,' is given. A diagnosis followed by 'NOS' does not put the principal diagnosis in doubt." *Slaten v. Comm'r of Soc. Sec. Admin.*, No. 06–1660, 2008 WL 4192282, at *4 n.12 (D.N.J. Sept. 9, 2008) (citation omitted).

[2] "A GAF score is a rough estimate of an individual's psychological, social, and occupational functioning used to reflect the individual's need for treatment." *Vargas v. Lambert*, 159 F.3d 1161, 1164 n.2 (9th Cir. 1998). "A GAF of 60 to 70 indicates some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." *Crowell v. Astrue*, No. 3:11–cv–00094–HU, 2012 WL 6706023, at *8 n.3 (D. Or. Sept. 12, 2012) (citation, quotation marks, and brackets omitted).

Lee was admitted to Sacred Heart Medical Center on November 7, 2007, with an exacerbation of chronic obstructive pulmonary disease ("COPD"). Lee, a long-term smoker who had been counseled on cessation of tobacco use, reported experiencing shortness of breath and constant wheezing during the previous two weeks, despite the use of albuterol and ipratropium three to four times a day.[3] Dr. Deborah Lang noted that Lee "smelled heavily of tobacco at [the] time of admission," and that Lee's symptoms were relieved by a high-dose treatment of intravenous Solu-Medrol.[4] (Tr. 255.) Lee was discharged from Sacred Heart Medical Center four days later and resumed taking oral prednisone.[5]

On January 9, 2008, Lee returned to the office of her primary care physician, Dr. Michael Laurie ("Dr. Laurie"), complaining of continued depression. Lee reported that Zoloft had proved to be ineffective but denied any suicidal ideation. Dr. Laurie noted that Lee was under a great deal of stress due to "[in]adequate financial help with her bills," and that she was currently working with a social worker. (Tr. 286.) Dr. Laurie prescribed Effexor to treat Lee's symptoms of depression, but also made sure Lee was aware that he doubted whether antidepressants were "the entire answer to her problems." (Tr. 286.)

---

[3] "Albuterol and ipratropium are drugs that treat asthma by expanding the bronchial tubes." *Cortright v. Colvin*, No. 13-cv-5422, 2014 WL 4384110, at *5 n.14 (S.D.N.Y. Aug. 29, 2014) (citation omitted).

[4] Solu-Medrol is a corticosteroid that relaxes the bronchial tubes. *Kelly v. Wehrum*, No. 98-3172, 1999 WL 455327, at *1 (6th Cir. June 23, 1999).

[5] "Prednisone is a synthetic derivative of cortisone used primarily for its anti-inflammatory effects and its modification of immune responses." *Champion v. S&M Traylor Bros.*, 690 F.2d 285, 289 n.8 (D.C. Cir. 1982).

Page 3 - FINDINGS AND RECOMMENDATION

Dr. Laurie sent Lee for x-rays of the chest on February 4, 2008, after Lee complained of a cough. The x-rays revealed a normal heart, clear lung fields, and normal pulmonary vessels. Dr. Laurie nonetheless provided Lee with a three-day work release on February 7, 2008, because Lee thought "that if she had three days off of work her symptoms w[ould] improve[.]" (Tr. 282.) During a subsequent visit on February 29, 2008, Dr. Laurie noted that Lee was having difficulty controlling her diabetes and had recently run her car into a ditch, but that her asthma-related problems had improved. Dr. Laurie provided Lee with a prescription sample of Celebrex for leg pain and recommended that she increase her daily insulin injections.

On March 11, 2008, Dr. Peter LeBray ("Dr. LeBray"), a non-examining state agency psychologist, completed a Psychiatric Review Technique Form ("PRTF"), wherein he evaluated Lee's impairments under listing 12.04 (affective disorders).[6] Dr. LeBray concluded that the limitations imposed by Lee's impairments failed to satisfy listing 12.04. Dr. LeBray noted that Lee had not experienced any episodes of decompensation of an extended duration or restriction of activities of daily living, and that she was mildly limited in terms of social functioning and concentration, persistence, or pace.

Also on March 11, 2008, Dr. Richard Alley ("Dr. Alley"), a non-examining state agency physician, completed a Physical Residual Functional Capacity Assessment ("PRFCA"). Dr. Alley concluded that Lee: (1) could lift and/or carry twenty pounds occasionally and ten pounds frequently; (2) could stand, walk, and sit about six hours in an eight-hour workday; (3) could push and/or pull without limitation; (4) could occasionally climb a ladder, rope, and scaffolds and

---

[6] The Listing of Impairments is found at 20 C.F.R. Part 404, Subpart P, Appendix 1, and described at 20 C.F.R. §§ 404.1525, 404.1526, 416.925, 416.926.

frequently climb ramps and stairs, balance, kneel, crouch, and crawl (postural limitations); (5) had no manipulative, visual, or communicative limitations; and (6) should avoid concentrated exposure to hazards and even moderate exposure to fumes, odors, dusts, gases, and poorly ventilated areas (environmental limitations).

On July 14, 2009, Lee completed an Adult Function Report in support of her application for disability insurance benefits. Lee described her typical day as consisting of making coffee, washing dishes, taking insulin and other medications she can afford, watching television, doing laundry, sending emails, and going fishing from time to time. Lee stated that she takes care of animals and her husband, has no difficulty with personal care, shops in stores, and is capable of driving, preparing meals, paying bills, counting change, handling a savings account, and using money orders. However, Lee indicated that her physical and mental impairments limit her ability to walk, see, complete tasks, concentrate, follow instructions, get along with others, and comprehend information.

On August 4, 2009, Dr. J. Scott Pritchard ("Dr. Pritchard"), a non-examining state agency physician, completed a second PRFCA. Dr. Pritchard concluded that Lee had no exertional, postural, manipulative, visual, or communicative limitations, but she needed to avoid concentrated exposure to fumes, odors, dusts, gases, and poorly ventilated areas.

On September 15, 2009, Disability Determination Services referred Lee to Dr. Alison Prescott ("Dr. Prescott") for a psychological evaluation. Dr. Prescott's diagnostic impressions included: recurrent major depressive disorder (Axis I); personality disorder not otherwise specified (Axis II); and diabetes mellitus, hypertension, and asthma (Axis III). Dr. Prescott noted that Lee had low-average intellectual functioning, but "a fairly good range" of activities of daily living, despite "significant health issues such as diabetes, COPD, hypertension, and cataracts." (Tr. 421.)

On October 6, 2009, Dr. Joshua Boyd ("Dr. Boyd"), a non-examining state agency psychologist, completed a second PRTF, wherein he evaluated Lee's impairments under listings 12.04 (affective disorders) and 12.08 (personality disorders). Dr. Boyd concluded that the limitations imposed by Lee's impairments failed to satisfy listing 12.04 or 12.08. Dr. Boyd noted that Lee had not experienced any episodes of decompensation of an extended duration, but she had experienced moderate difficulty in maintaining social functioning, mild restriction of activities of daily living, and mild difficulties in maintaining concentration, persistence, or pace.

That same day, October 6, 2009, Dr. Boyd completed a Mental Residual Functional Capacity Assessment ("MRFCA"). Dr. Boyd described Lee as moderately limited in two of twenty categories of mental activity and not significantly limited in seventeen. Dr. Boyd did not include a rating for the category titled "[t]he ability to remember locations and work-life procedures." (Tr. 437.) The two categories of moderate limitation were the "ability to interact appropriately with the general public" and the "ability to set realistic goals or make plans independently of others." (Tr. 438.) Dr. Boyd noted that Lee would benefit from vocational guidance and was capable of "get[ting] along on [a] casual, routine social basis [with] co[-]workers," despite being unable to engage closely with the general public. (Tr. 439.)

On February 25, 2010, Lee was referred to Dr. DeWayde Perry ("Dr. Perry") for a neurological examination. Lee, who was fifty-years-old at the time of Dr. Perry's examination, complained primarily of COPD and bilateral hand numbness. In terms of her functional limitations, Dr. Perry opined that Lee: (1) could stand and walk for up to six hours; (2) could lift or carry twenty pounds occasionally and ten pounds frequently; (3) could occasionally climb, balance, stoop, kneel, crouch, or crawl; and (4) should avoid extremes in temperatures, chemicals, dusts, fumes, gases,

Page 6 - FINDINGS AND RECOMMENDATION

heights, heavy machinery, and excessive noise. Dr. Perry's diagnoses included diabetic peripheral neuropathy, obesity, and probable peripheral vascular disease.

On March 22, 2010, Dr. Sharon Eder ("Dr. Eder"), a non-examining state agency physician, completed a third PRFCA. Dr. Eder concluded that Lee: (1) could lift and/or carry twenty pounds occasionally and ten pounds frequently; (2) could stand, walk, and sit about six hours in an eight-hour workday; (3) could push and/or pull without limitation; (4) could frequently balance and occasionally climb, stoop, kneel, crouch, and crawl (postural limitations); (5) had no manipulative, visual, or communicative limitations; and (6) should avoid concentrated exposure to hazards and even moderate exposure to fumes, odors, dusts, gases, and poorly ventilated areas (environmental limitations).

On May 14, 2010, Lee was referred to Dr. Charlotte Higgins-Lee ("Dr. Higgins-Lee") for a neuropsychological evaluation. Dr. Higgins-Lee's diagnostic impressions included: depression not otherwise specified, PTSD, cognitive disorder not otherwise specified, and rule out body dysmorphic disorder (Axis I); rule out non-verbal learning disorder (Axis II); a history of significant illnesses such as asthma, COPD, diabetes, hyperlipidemia, and hypertension (Axis III); health, psychiatric, family, financial, and occupational stressors (Axis IV); and a GAF score of 45.[7] Dr. Higgins-Lee also made the following recommendations:

> 1. Ms. Lee needs to be referred for a medication evaluation and psychotherapy to alleviate depression and symptoms of [PTSD].

> 2. It is also recommended that she participate in [Eye Movement Desensitization and Reprocessing] therapy for [PTSD].

---

[7] "A GAF score of 45 indicates serious symptoms or serious impairment in social, occupational, or school functioning." *Nuhbegovich v. Colvin*, No. 14-cv-2285, 2014 WL 7384369, at *4 n.4 (C.D. Cal. Dec. 29, 2014) (citation omitted).

Page 7 - FINDINGS AND RECOMMENDATION

3. After improvement of psychological disorders, she should complete a neuropsych[ological] evaluation to determine if her delayed memory has improved and employability has improved.

4. Vocations should be explored to determine an appropriate choice given her physical disability and spatial perception impairment.

(Tr. 501.)

On October 12, 2010, one week after Lee presented for an initial consultation, Dr. Judy Pinsonneault ("Dr. Pinsonneault") drafted a letter in support of Lee's application for disability insurance benefits.[8] Dr. Pinsonneault's letter stated:

Mary Lee presented to me for an initial office visit on [October 5, 2010]. During this office visit and by review of her medical records, I found her to have several chronic medical conditions which include Insulin dependent Diabetes Mellit[u]s, Asthma, Anxiety, Depression and Hyperlipidemia. Currently she seems to be well controlled on her medications but will require close follow up.

In light of her medical and psychiatric conditions, she is permanently disabled from employment. Her conditions will continue for the rest of her life and several of them are progressive in nature.

Should you have any further questions, please feel free to contact me. Of course, the patient's signed consent will be require[d] before I can release any information.

(Tr. 465.)

In a supplemental letter dated October 27, 2010, Dr. Pinsonneault noted that Lee "is unable to work in any capacity for an [eight] hour workday" because "[h]er Asthma interfer[e]s with any

---

[8] A doctor of osteopathic medicine, such as Dr. Pinsonneault, is an acceptable medical source under the Social Security regulations. *See Gonzales v. Colvin*, No. 13-1421, 2014 WL 4656470, at *3 n.3 (C.D. Cal. Sept. 17, 2014). "Osteopathy adheres to the principle that a patient's history of illness and physical trauma are written into the body's structure. Osteopathic physicians therefore complete additional training in the study of hands-on manual medicine and the body's musculoskeletal system to permit them to feel (palpitate) the patient's living anatomy (the flow of fluids, motion and texture of tissues, and structural makeup)." *Id.* (internal citation and quotation marks omitted).

physical activities such as walking more than [thirty] minutes, lifting or carrying," and because Lee's "mental condition interfer[e]s with her concentration and ability to interact with others." (Tr. 466.) Dr. Pinsonneault issued a materially identical letter on August 8, 2011.

On August 31, 2011, at the age of fifty-two, Lee testified at a hearing before an Administrative Law Judge ("ALJ"). Lee reported that she voluntarily left her job at PeaceHealth Medical Group in April 2009, apparently anticipating that she would be fired after being written up three times for job performance-related issues. Lee testified that she is capable of shopping for groceries, cooking meals, gardening, doing laundry, and washing the dishes. Lee referred to herself as the "housekeeper" in the three-bedroom house she shares with her husband and friend. (Tr. 36.) Lee stated that her hobbies include watching television, searching the Internet, returning emails, and volunteering at the Moose Club once a week calling bingo numbers.[9] Lee testified that she has difficulty with incontinence, staying focused, dust, and driving at night.

Lee's friend, housemate, and former co-worker, Margaret Hicks ("Hicks"), also testified at the hearing before the ALJ. Hicks testified that she had been living with Lee and her husband for approximately five months and helps them to pay the rent. Hicks further testified that Lee enjoys fishing and ceramics, but has difficulty with crowds and enclosed spaces, sleeping, vacuuming, dusting and physical exertion due to her breathing issues, staying focused, remembering to take her medications or complete certain tasks around the house, staying organized, and maintaining a stable mood.

A vocational expert ("VE") testified at Lee's hearing. The ALJ asked the VE to assume that a hypothetical worker of Lee's age, education, and work experience could lift twenty pounds

---

[9] A treatment note from January 2011 also indicates that Lee is active in her church.

occasionally and ten pounds frequently, sit, stand, or walk no more than six hours in an eight-hour workday, push and/or pull without limitation, and frequently balance, occasionally climb, stoop, kneel, crouch, and crawl. The hypothetical worker also needed to be limited to simple repetitive job duties, and avoid engaging closely with the general public and exposure to respiratory irritants such as fumes, dust, and odors. The VE testified that the hypothetical worker would not be able to perform Lee's past relevant work, but she could be employed as a small products assembler, packing line worker, or garment sorter. The VE then stated that there were 218,391 small products assembler jobs in the national economy, including 1,730 positions in Oregon; 312,403 packing line worker jobs in the national economy, including 1,591 positions in Oregon; and 125,960 garment sorter jobs in the national economy, including 790 positions in Oregon.

Lee's attorney then asked the VE a series of questions pertaining to the three jobs identified as suitable for the hypothetical worker. The VE confirmed that the small products assembler job would require the hypothetical worker to concentrate for up to two hours and work in proximity to other people. The VE next confirmed that the packing line worker job would require the hypothetical worker to concentrate for an unspecified period of time (presumably two hours based on the VE's statement regarding break periods), and work in proximity to other people. Lastly, the VE confirmed that the garment sorter job would require the hypothetical worker to concentrate for up to two hours, and that needing continuous reminders from a supervisor to get "back on track" (e.g., every two hours) would lead to the hypothetical worker being terminated within a few days.[10] (Tr. 55.)

---

[10] During the hearing, the ALJ acknowledged that if the ALJ were to accept Drs. Higgins-Lee and Pinsonneault's opinions as to Lee's limitations, Lee would be unable to perform the three jobs identified by the VE.

Page 10 - FINDINGS AND RECOMMENDATION

In a written decision issued on October 14, 2011, the ALJ applied the five-step sequential process set forth in 20 C.F.R. §§ 404.1520 and 416.920, and found that Lee was not disabled. *See infra* Part II.A-B. The Social Security Administration Appeals Council denied Lee's petition for review, making the ALJ's order the final agency order. Lee timely appealed to the federal district court.

## II. THE FIVE-STEP SEQUENTIAL PROCESS

### A.    Legal Standard

A claimant is considered disabled if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A). "Social Security Regulations set out a five-step sequential process for determining whether an applicant is disabled within the meaning of the Social Security Act." *Keyser v. Comm'r Soc. Sec. Admin.*, 648 F.3d 721, 724 (9th Cir. 2011). Those five steps are as follows:

> (1) Is the claimant presently working in a substantially gainful activity? (2) Is the claimant's impairment severe? (3) Does the impairment meet or equal [one of the listed impairments]? (4) Is the claimant able to perform any work that he or she has done in the past? and (5) Are there significant numbers of jobs in the national economy that the claimant can perform?

*Id.* at 724-25. The claimant bears the burden of proof for the first four steps in the process. *Bustamante v Massanari*, 262 F.3d 949, 953-54 (9th Cir. 2001). If the claimant fails to meet the burden at any of those four steps, the claimant is not disabled. *Id.*; *Bowen v. Yuckert*, 482 U.S. 137, 140-41 (1987).

The Commissioner bears the burden of proof at step five of the process, where the Commissioner must show the claimant can perform other work that exists in significant numbers

in the national economy, "taking into consideration the claimant's residual functional capacity, age, education, and work experience." *Tackett v. Apfel*, 180 F.3d 1094, 1100 (9th Cir. 1999). If the Commissioner fails to meet this burden, the claimant is disabled. *Bustamante*, 262 F.3d at 954 (citations omitted).

**B**.    **The ALJ's Decision**

At the first step of the five-step sequential evaluation process, the ALJ found that Lee had engaged in substantial gainful activity since November 13, 2007, the alleged disability onset date, but "continue[d] with the sequential evaluation [since] there [wa]s a period remaining at issue." (Tr. 11.) At the second step, the ALJ found that Lee had the severe impairments of type II insulin-dependent diabetes mellitus, obesity, asthma, major depressive disorder, and personality disorder not otherwise specified.

At the third step, the ALJ found that Lee's combination of impairments was not the equivalent of those on the Listing of Impairments. The ALJ then assessed Lee's residual functional capacity ("RFC") and found that she could perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), subject to the following limitations: (1) she can occasionally climb, stoop, kneel, crouch, and crawl; (2) she must avoid concentrated exposure to workplace hazards and even moderate exposure to fumes, dusts, gases, odors, and poorly ventilated areas; (3) although she can sustain routine, casual interaction with co-workers, she should not closely engage with the public; and (4) she can perform simple repetitive tasks.

At the fourth step, the ALJ noted that Lee was unable to perform any past relevant work. At the fifth step, in light of Lee's age, education, work experience, and RFC, the ALJ found that there were jobs existing in significant numbers in the national economy that she could perform, such as

a small parts assembler, packing line worker, and garment sorter. Based on the finding that Lee could perform jobs existing in significant numbers in the national economy, the ALJ concluded that Lee was not disabled, as defined under the Social Security Act, from the alleged onset date through the date of the decision.

## III. STANDARD OF REVIEW

The district court may set aside a denial of benefits only if the Commissioner's findings are "'not supported by substantial evidence or [are] based on legal error.'" *Bray v. Comm'r Soc. Sec. Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009) (quoting *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006)). Substantial evidence is "'more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)).

The district court "cannot affirm the Commissioner's decision 'simply by isolating a specific quantum of supporting evidence.'" *Holohan v. Massanari*, 246 F.3d 1195, 1201 (9th Cir. 2001) (quoting *Tackett*, 180 F.3d at 1097). Instead, the district court must consider the entire record, weighing both the evidence that supports the Commissioner's conclusions, and the evidence that detracts from those conclusions. *Id.* However, if the evidence as a whole can support more than one rational interpretation, the ALJ's decision must be upheld; the district court may not substitute its judgment for the ALJ's. *Bray*, 554 F.3d at 1222 (citing *Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007)).

## IV. DISCUSSION

On appeal, Lee argues that the ALJ: (1) improperly rejected the opinion of her treating physician, Dr. Pinsonneault; (2) improperly rejected the opinion of her examining psychologist, Dr.

Higgins-Lee; (3) failed to provide clear and convincing reasons for discrediting her subjective symptom testimony; (4) failed to explain his reasons for disregarding Hicks' lay witness testimony; and (5) erred in concluding at step five that she could perform other work existing in the national economy. This Court holds that the ALJ did not err, and recommends that the district court affirm the Commissioner's decision.

## A.    Medical Opinions

"There are three types of medical opinions in social security cases: those from treating physicians, examining physicians, and non-examining physicians." *Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 692 (9th Cir. 2009) (citing *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995)). In the event "a treating or examining physician's opinion is contradicted by another doctor, the '[ALJ] must determine credibility and resolve the conflict.'" *Id.* (quoting *Thomas v. Barnhart*, 278 F.3d 947, 956-57 (9th Cir. 2002)). "If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence [in the record]." *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014) (citation omitted).

"An ALJ can satisfy the 'substantial evidence' requirement by 'setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings.'" *Id.* (quoting *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998)). But "[t]he ALJ must do more than state conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct." *Id.* Indeed, "an ALJ errs when he rejects a medical opinion or assigns it little weight while doing nothing more than ignoring it, asserting without explanation that another medical opinion is more persuasive, or criticizing it with boilerplate

language that fails to offer a substantive basis for his conclusion." *Id*. at 1012-13 (citing *Nguyen v. Chater*, 100 F.3d 1462, 1464 (9th Cir. 1996)).

### 1.  Dr. Pinsonneault

Lee maintains that the ALJ improperly rejected the opinion of her treating physician, Dr. Pinsonneault. The Court disagrees.

Lee established a treating relationship with Dr. Pinsonneault on October 5, 2010. In a letter dated October 12, 2010, Dr. Pinsonneault concluded that Lee was "permanently disabled from employment," and that "she seem[ed] to be well controlled on her medications but w[ould] require close follow up." (Tr. 465.) In subsequent letters issued on October 27, 2010 and August 8, 2011, Dr. Pinsonneault stated that she believed Lee was "unable to work in any capacity for an [eight] hour workday" because "[h]er Asthma interfer[e]s with any physical activities such as walking more than [thirty] minutes, lifting or carrying," and because "[h]er mental condition interfer[e]s with her concentration and ability to interact with others." (Tr. 466, 502.)

The ALJ explained that he gave "no weight" to Dr. Pinsonneault's opinion, because "it is unsupported by medically acceptable clinical and laboratory diagnostic techniques and is inconsistent with the other substantial evidence in the case record," and because "the ultimate issue of disability is one reserved to the Commissioner." (Tr. 16.) The ALJ also noted that Dr. Pinsonneault's initial letter was based on a one-time consultation, that Lee's RFC accounts for the moderate limitation in concentration and social functioning identified by Dr. Pinsonneault in follow-up letters, and that Dr. Pinsonneault had acknowledged that Lee's impairments are "well controlled on her medications but w[ould] require close follow up." (Tr. 16.) The ALJ also assigned significant

weight to the assessments provided by the several non-examining state agency physicians and psychologists, which contradicted in part Dr. Pinsonneault's conclusions.

### a.    The Ultimate Issue of Disability

Citing *Hill v. Astrue*, 698 F.3d 1153 (9th Cir. 2012), Lee asserts that the ALJ erred by rejecting Dr. Pinsonneault's opinion that Lee is "permanently disabled from employment" on the ground that "the ultimate issue of disability is one reserved to the Commissioner." In *Hill*, an examining psychologist found that the claimant's combination of impairments made the likelihood of sustained full-time competitive employment unlikely, and the ALJ's decision did not address this finding. *Id*. at 1159. On appeal in *Hill*, the Commissioner argued that the ALJ's failure to consider the "opinion was harmless because an opinion that an individual cannot work is an opinion on an issue reserved to the Commissioner and, therefore, it is not binding." *Id*. at 1160. The Ninth Circuit disagreed, noting that the psychologist's statement that the claimant would be unlikely to work full-time was not a conclusory statement. *Id*. Rather, the record indicated that it was "an assessment, based on objective medical evidence, of [the claimant]'s likelihood of being able to sustain full time employment given the many medical and mental impairments [the claimant] face[d] and her inability to afford treatment for those conditions." *Id*. The Ninth Circuit concluded that the ALJ's silent disregard of the psychologist's medical opinion was not harmless error. *Id*.

*Hill* instructs that an ALJ must evaluate every medical opinion in the record. *See also* 20 C.F.R. § 404.1527(c) ("Regardless of its source, we will evaluate every medical opinion we receive."). Unlike the ALJ in *Hill*, however, the ALJ here did not merely ignore Dr. Pinsonneault's opinion. On the contrary, the ALJ evaluated Dr. Pinsonneault's opinion in accordance with 20 C.F.R. § 404.1527(c). Furthermore, unlike the *Hill* psychologist's non-conclusory opinion that it was

Page 16 - FINDINGS AND RECOMMENDATION

unlikely that the claimant would be able to work full-time, Dr. Pinsonneault's statement that Lee is "permanently disabled" is both conclusory and a legal conclusion reserved to the ALJ. *Cf. Schuff v. Astrue*, 327 F. App'x 756, 758 (9th Cir. 2009) ("[T]he ALJ was not required to accept Drs. Van Belois and Lindsay's opinions that Schuff was unable to work because the ultimate issue of disability is reserved to the Commissioner."). The ALJ's disregard of that opinion was not error.

### b.    Limitations in Concentration and Social Functioning

Lee also challenges the ALJ's finding that the RFC adequately addresses her limitations in concentration and social functioning. With regard to Lee's limitations in social functioning, Dr. Pinsonneault opined that Lee's mental condition generally "interferes" with her ability to interact with others. Non-examining state agency psychologist Dr. Boyd found that Lee "should not closely engage [the] public," but "[c]an otherwise get along on [a] casual, routine basis [with] co[-]workers," despite experiencing moderate difficulties in maintaining social functioning. (Tr. 433, 439.) Dr. Boyd's opinion is not inconsistent with Dr. Pinsonneault's assessment that Lee's mental condition generally "interferes" with her ability to interact with others. This Court finds that the RFC, which recognized that "although [Lee] can sustain routine, casual interaction with co-workers, she should not closely engage with the public," appropriately accounted for Lee's limitations in social functioning identified by both Dr. Pinsonneault and Dr. Boyd. A more restrictive social limitation would be incompatible with, *inter alia*, Lee's ability to volunteer at the Moose Club once a week calling bingo numbers, serve as an active member of her church, cohabit with a non-familial roommate, and work as a CNA until April 2009 (keeping in mind that she alleged the onset of total disability in November 2007).

Lee also points to the ALJ's conclusion that she has "moderate" difficulties with concentration, persistence, or pace, and argues that the RFC restriction "to simple, repetitive tasks . . . does not address deficiencies in concentration, persistence, or pace." (Pl.'s Br. at 13) (citing *Lubin v. Comm'r of Soc. Sec. Admin.*, 507 F. App'x 709 (9th Cir. 2013)). There is conflicting authority regarding whether a restriction to "simple, repetitive" tasks properly incorporates a claimant's moderate difficulties as to concentration, persistence, or pace. *Compare Lubin*, 507 F. App'x at 712 (holding that where the claimant had moderate difficulties in maintaining concentration, persistence, or pace, an RFC limiting claimant "to one to three step tasks" did not capture the limitation), *and Brink v. Comm'r Soc. Sec. Admin.*, 343 F. App'x 211 (9th Cir. 2009) (holding that "simple, repetitive work" did not sufficiently encompass the claimant's moderate difficulties with concentration, persistence, or pace), *with Stubbs-Danielson v. Astrue*, 539 F.3d 1169, 1174 (9th Cir. 2008) (holding that RFC limiting claimant to "simple, routine, repetitive . . . work" adequately encompassed the claimant's moderate difficulties with pace), *and Sabin v. Astrue*, 337 F. App'x 617, 621 (9th Cir. 2009) (holding that an RFC limiting claimant to "simple and repetitive tasks on a consistent basis" adequately captured the claimant's moderate difficulties as to concentration, persistence, or pace). The appropriate individualized analysis turns on whether a restriction to simple and repetitive work is consistent with restrictions identified in the claimant's medical record. *See Stubbs-Danielson*, 539 F.3d at 1173 ("[A]n ALJ's assessment of a claimant adequately captures restrictions related to concentration, persistence, or pace where the assessment is consistent with restrictions identified in the medical testimony").

Here, the RFC restriction to "simple, repetitive tasks" appropriately addresses Lee's concentration difficulties. Although, on the one hand, the record contains conclusory medical

opinions that Lee is limited in her ability to concentrate, the record is replete with simple, repetitive

tasks Lee successfully performs on a regular basis: calling bingo numbers, fishing, serving as an

active member of her church, sending emails, taking care of animals and her husband, shopping in

stores, driving, preparing meals, paying bills, counting change, handling a savings account, using

money orders, and working as a CNA (until April 2009). The Court finds that here, as in *Stubbs-*

*Danielson* and *Sabin*, an RFC restricting Lee to "simple, repetitive tasks" appropriately encompasses

her moderate difficulties in concentration.

In any event, unlike in *Lubin* and *Brink*, here the ALJ included in the VE hypothetical more

restrictive non-exertional limitations than just the "simple repetitive" restriction in the RFC:

> From a non-exertional standpoint, there should be [a] limitation to simple repetitive
> job duties. For example, even though this [prior fast-food management position] is
> not a qualifying job, the [Specific Vocational Preparation level of] 5, skilled work
> is out of the question [for this individual] and perhaps even the semi-skilled
> occupations. That's up to you. We have one [past job] at [SVP] 4 and two at 3. It's
> simple, repetitive type work. [The medical professionals] also indicate that she
> shouldn't engage closely with the public and can get along with coworkers on a
> casual routine basis.

(Tr. 52.) *See also Powers v. Colvin*, No. 6:13–cv–00943–BR, 2014 WL 2803050, at *5 (D. Or. June

19, 2014) (distinguishing *Brink* where "the ALJ included in [the claimant]'s RFC more restrictive

limitations than just 'simple, repetitive' tasks in order to account for [the claimant]'s limitations in

concentration, persistence, or pace."). This Court finds that the ALJ's RFC and VE hypothetical

appropriately addressed Lee's deficiencies in concentration, persistence, or pace.

### c.    Specific and Legitimate Reasons for Rejecting the Opinion

The Court also disagrees with Lee's assertion that the ALJ erred by discrediting Dr.

Pinsonneault's opinion without providing specific and legitimate reasons.

The ALJ made it clear that he assigned no weight to Dr. Pinsonneault's opinion, and he discussed several specific and legitimate reasons in support of his position. For example, the ALJ highlighted Dr. Pinsonneault's assessment that Lee "seem[ed] to be well controlled on her medications but w[ould] require close follow up." In a recent unpublished decision from the Ninth Circuit, the ALJ gave only some weight to the medical opinion of the claimant's treating physician because the physician noted that the claimant's "condition could be well controlled with treatment." *Rusten v. Comm'r of Soc. Sec. Admin.*, 468 F. App'x 717, 720 (9th Cir. 2012). The Ninth Circuit rejected the claimant's argument that the ALJ erred in doing so, stating: "Medical impairments that can be effectively controlled with medication are not disabling. The ALJ's reason for giving [the treating physician]'s testimony only some weight was therefore supported by specific and legitimate reasons supported by the record." *Id.* (citing *Warre v. Comm'r of Soc. Sec. Admin.*, 439 F.3d 1001, 1006 (9th Cir. 2006)). So too here.

Lee counters that Dr. Pinsonneault's treatment notes indicate that there were instances where Lee had difficulty controlling her emotions and blood sugar levels, suggesting that Lee's depression and diabetes were not adequately controlled by medication. While Dr. Pinsonneault stated that Lee was "very emotional" during a consultation on November 2, 2010, she subsequently stated that Lee appeared in no apparent distress during a follow-up visit on November 16, 2010. (Tr. 474, 477.) Furthermore, when Lee appeared depressed and teary-eyed during a consultation on January 14, 2011, it was the anniversary of her mother's death, her friend was "leaving," and she was having difficulty with her finances. (Tr. 470.) When considered in their proper context, the examples cited by Lee fail to negate that her conditions were adequately controlled by medication. This conclusion is also supported by Dr. Schur's February 2007 examination. Dr. Schur assigned Lee a GAF score

of 65, and Lee scored within the range of mild depressive symptoms on a Patient Health Questionnaire–9, "a screening tool that relies on patient self-reporting[.]" *Reyes v. Colvin*, No. 13-cv-4683, 2015 WL 337483, at *3 (S.D.N.Y. Jan. 26, 2015).

Lee also points to her inability to control her diabetes, but the record is not clear if Lee's difficulty controlling her blood sugar levels was attributable to ineffective medication, or to her failure to follow Dr. Pinsonneault's prescribed course of treatment. During a follow-up visit on October 19, 2010, Dr. Pinsonneault discussed the results of Lee's recent HGBA1C test, which produced a level of 10.2% with a fasting blood sugar of 270.[11] Dr. Pinsonneault noted that Lee was aware that "her blood sugar [wa]s out of control and [that Lee was] ready to make some changes," and Dr. Pinsonneault explained "that many of her physical symptoms [we]re related to her high blood sugar." (Tr. 479.) Dr. Pinsonneault therefore provided Lee with unspecified "written instructions regarding blood sugar" and asked her to follow up in two weeks. (Tr. 480.) When Lee returned to her office on November 2, 2010, Dr. Pinsonneault noted that Lee's diabetes had improved and that her morning blood sugar level was 127. Dr. Pinsonneault also stated that Lee's Lantus injections had been increased to 40 units per day, and she encouraged Lee's progress.[12] During a follow-up visit on December 14, 2010, Lee reported a significant increase in her blood

---

[11] "Also known as an A1C or glycated hemoglobin test, this blood test provides a long term look at the patient's average blood sugar control for the past [two] to [three] months." *Cabello v. Grace*, No. 08–1334, 2011 WL 902340, at *4 n.6 (M.D. Pa. Mar. 15, 2011) (citation omitted). "The normal A1C level is 7% according to the American Diabetes Association and 6.5% according to the American Association of Clinical Endocrinologists. An A1C level of 10% translates to an estimated average glucose of 240. . . . Normal fasting blood glucose is 70–99 and normal blood glucose 2 hours after eating is 70–145." *Shedden v. Astrue*, No. 4:10–CV–2515, 2012 WL 760632, at *7 n.30 (M.D. Pa. Mar. 7, 2012) (citations omitted).

[12] Lantus is a form of insulin that acts within thirty minutes to two hours. *Sours v. Big Sandy Reg'l Jail Auth.*, 593 F. App'x 478, 480 (6th Cir. 2014).

sugar levels again. After reviewing the situation, Dr. Pinsonneault concluded that Lee had "only been taking 30 units of Lantus when she was up to 40 [units] and doing well." (Tr. 472.) Dr. Pinsonneault instructed Lee to increase the Lantus injections to 40 units per day. The following month, on January 14, 2011, Dr. Pinsonneault instructed Lee to increase her Lantus injections to 50 units per day. Lee did not return to Dr. Pinsonneault's office until April 4, 2011, when she reported "having high [b]lood sugar readings." (Tr. 468.) Dr. Pinsonneault again counseled Lee on her use of medications and told her to increase the Lantus injections to 50 units "as she ha[d] only been taking 40" units on a nightly basis. (Tr. 469.)

It is clear from the foregoing that while Lee had difficulty controlling her blood sugar levels, that was due in large part to her unwillingness to follow Dr. Pinsonneault's prescribed course of treatment. That does not mean that Lee's diabetes would not be well controlled if she followed Dr. Pinsonneault's instructions. Indeed, the longitudinal record reasonably suggests improved control of Lee's blood sugar levels with treatment compliance. For example, in late August 2007, Lee informed Dr. Laurie that her blood sugars usually "run about 110 to 140," but "it was 429 approximately" the prior day. (Tr. 306.) Lee, who was employed as a CNA at the time, told Dr. Laurie that she had not taken her insulin in a week, which promoted Dr. Laurie to "encourage her to fill her insulin as soon as possible[.]" (Tr. 308.) Just one month later, Lee reported that "her blood sugars [we]re in good control." (Tr. 296, 311.) Then in late August 2008, Dr. Lynn Morris administered a HGBA1C test that produced a level of 7.5%, with 7% being the "[t]arget for [d]iabetes [c]ontrol." (Tr. 353.) In light of the foregoing, and in accordance with the Ninth Circuit's opinion in *Rusten*, the Court concludes the ALJ's determination that Lee's impairments were well

Page 22 - FINDINGS AND RECOMMENDATION

controlled on medication is a "specific and legitimate reason" for giving Dr. Pinsonneault's opinion no weight.[13]

The ALJ also identified internal inconsistencies in Dr. Pinsonneault's records, which is another specific and legitimate reason for giving Dr. Pinsonneault's opinion no weight. *See Salchenberg v. Colvin*, 534 F. App'x 586, 588 (9th Cir. 2013) (noting that internal inconsistencies in an examining psychologist's report constituted a specific and legitimate reason to discount the opinion). As the ALJ noted in his written decision, it is inconsistent to state that Lee "is permanently disabled" when she seemed to be well controlled on medication.[14] (Tr. 16, 465.) It was reasonable for the ALJ to reject Dr. Pinsonneault's opinion on this ground. *See Myers v. Barnhart*, No. 04-cv-994, 2006 WL 1663848, at *6 n.7 (C.D. Cal. June 6, 2006) ("Where a treating physician's conclusions about a claimant's functional limitations 'are not supported by h[er] own treatment notes,' the ALJ may reject that opinion.") (citation omitted); *Richie v. Colvin*, 564 F. App'x 336, 338 (9th Cir. 2014) (upholding rejection of treating physician's opinion based, in part, on his own notes failing to substantiate his view regarding the claimant's limitations).

The ALJ discussed several other reasons for assigning no weight to Dr. Pinsonneault's opinion. The ALJ considered the length of Dr. Pinsonneault's treating relationship, noting that Dr.

---

[13] The ALJ also could have considered Lee's noncompliance in determining the weight to accord Dr. Pinsonneault's opinion. *See Carillo v. Comm'r of Soc. Sec.*, No. 1:10–cv–01828, 2012 WL 3639117, at *7 (E.D. Cal. Aug. 23, 2012) ("concluding that ALJ properly considered claimant's 'noncompliance for purposes of determining the weight to give [doctor's] medical opinions'" (quoting *Owen v. Astrue*, 551 F.3d 792 (8th Cir. 2008)); *see also* 20 C.F.R. §§ 404.1530(b) ("If you do not follow the prescribed treatment without a good reason, we will not find you disabled.").

[14] The Court notes that Dr. Pinsonneault's follow-up letters do not indicate that Lee's impairments were poorly controlled on medication; rather, they simply expounded on why she continued to believe that Lee was permanently disabled.

Pinsonneault concluded in summary fashion that Lee was permanently disabled after a one-time consultation and a review of unspecified medical records. Although Lee visited Dr. Pinsonneault on more than one occasion, it was reasonable for the ALJ to take into consideration that Dr. Pinsonneault made sweeping and unsupported conclusions after just one visit. *See Cabrera v. Colvin*, No. 13–cv-7614, 2015 WL 46078, at *7 (C.D. Cal. Jan. 2, 2015) ("An ALJ may properly consider the length of the relationship between a treating physician and the claimant when determining the weight to be given to that treating physician's opinion."). The ALJ also could have considered the fact that Dr. Pinsonneault issued her first letter prior to receiving the results of pending laboratory reports.

In addition, the ALJ assigned weight to the assessments provided by the non-examining state agency physicians and psychologists. Unlike Dr. Pinsonneault's opinion, the ALJ found these several other assessments to be consistent with other substantial evidence in the record (i.e., the claimant working at a substantial gainful activity level for over a year post-onset date and then voluntarily leaving her job), and to be well-supported by medically acceptable clinical and laboratory diagnostic techniques. *See McLaughlin v. Colvin*, No. 2:13–cv–00780–SLG, 2014 WL 4799022, at *11 n.152 (D. Ariz. Sept. 26, 2014) (holding that inconsistencies with "a non-examining physician's testimony" is a specific and legitimate reason for discrediting a physician's opinion); *Espenas v. Colvin*, No. 3:14–cv–00355–HZ, 2014 WL 7405655, at *5 (D. Or. Dec. 30, 2014) (holding that specific and "legitimate reasons for rejecting a physician's opinion may include its . . . inconsistency with [other] medical records").

The Court concludes that all of the reasons the ALJ cited for assigning no weight to Dr. Pinsonneault's opinion were specific and legitimate reasons, supported by substantial evidence in the record.

### 2.    Dr. Higgins-Lee

The Court also holds that the ALJ did not err in his assessment of the opinion of Lee's examining psychologist, Dr. Higgins-Lee.

Lee was referred to Dr. Higgins-Lee for a neuropsychological evaluation on May 14, 2010. Dr. Higgins-Lee administered the following diagnostic procedures to Lee: a clinical interview, the Wechsler Abbreviated Scale of Intelligence (WASI), Wechsler Memory Scale—Third Edition (WMS-III), and Becker Depression Inventory (BDI). Dr. Higgins-Lee concluded that Lee's "psychological and neuropsych[ological] conditions ma[d]e it impossible to work at th[at] time." (Tr. 501.) However, Dr. Higgins-Lee also noted that Lee had "difficulty participating in the evaluation," "was very difficult to interview because she cried throughout the interview," and noted that "[i]t was necessary to do the evaluation in one afternoon . . . because she would not be able to come back to the office." (Tr. 495.)

The ALJ recognized that Dr. Higgins-Lee's examination "was conducted at the time of several stressful events in the claimant's life," and that Lee's "demeanor at the hearing was entirely different." (Tr. 16.) The ALJ then concluded that these circumstances undermined Dr. Higgins-Lee's findings:

> This pattern shows that [Lee] has a stable level of functioning; her condition was much worse at the time of [Dr. Higgins-Lee's evaluation] and returned to baseline, which is evidence[d] by her description of her various activities of daily living in her testimony. The person described in [Dr. Higgins-Lee's evaluation] is not the person who appeared at the hearing.

(Tr. 16.) The ALJ also questioned Dr. Higgins-Lee's assigned GAF score of 45:

> Because the GAF assessment is based on either the individual's symptoms or his/her functional impairments, where a medical source did not identify functional limitations that would provide a basis for the GAF score, the score may have been based on an individual's self-reported symptomatology. . . . [A] symptomatological basis for GAF scores may be undermined by an individual's lack of credibility.

> . . . A low GAF might [also] reflect difficulties in a wide range of functional areas. In contrast, the regulatory definition of disability focuses on occupational functioning. For example, marital stressors may result in a low GAF score, but these stressors have no direct correlation to a claimant's occupational functioning.

> . . . Thus, an individual's GAF score is not equivalent to a finding of disability under the five step sequential evaluation process set out in the regulations.

(Tr. 15-16.)[15]

Lee argues that the ALJ erred in failing to credit Dr. Higgins-Lee's opinion, because "[t]he record does not conflict with the level of impairment observed by Dr. Higgins-Lee and shown in testing." (Pl.'s Br. at 17.) In support of her argument, Lee cites examples in the record where she appeared or reported being emotionally labile, *see, e.g., supra* Part IV.A.1, and Dr. Prescott's September 2009 psychological evaluation, which noted that Lee was labile and had low intellectual function.

Contrary to Lee's arguments, the ALJ relied on specific and legitimate reasons for discrediting Dr. Higgins-Lee's opinion. Those reasons included Lee's activities of daily living and her presentation at the administrative hearing. *See Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d

---

[15] "In evaluating the severity of a claimant's mental impairments, a GAF score may help guide an ALJ's determination, but an ALJ is not bound to consider it." *Hammons v. Colvin*, No. 13-167, 2013 WL 5786092, at *10 (W.D. Wash. Oct. 28, 2013); *see also Orellana v. Astrue*, No. 1:06-cv-1166, 2008 WL 398834, at *9 (E.D. Cal. Feb.12, 2008) ("[W]hile a GAF score may help the ALJ assess a Claimant's ability to work, it is not essential and the ALJ's failure to rely on the GAF does not constitute an improper application of the law.").

595, 600–02 (9th Cir. 1999) (considering an inconsistency between a treating physician's opinion and a claimant's daily activities a specific and legitimate reason to discount the treating physician's opinion); *Aarestad v. Comm'r of Soc. Sec. Admin.*, 450 F. App'x 603, 605 (9th Cir. 2011) ("The ALJ gave specific and legitimate reasons for rejecting Drs. Smith and Askew's opinions. First, the ALJ found that Dr. Smith's opinions were inconsistent with [the claimant]'s own admitted daily activities and abilities and with actions that [the claimant] performed at the hearing."). Here, the ALJ explained his own interpretations of the record and why those interpretations, rather than Dr. Higgins-Lee's, were correct. Specifically, the ALJ noted that Lee's condition "was much worse" at the time of Dr. Higgins-Lee's evaluation because it "was conducted at the time of several stressful events in the claimant's life." (Tr. 16.) The events referred to by the ALJ included Lee's daughter moving away and Lee having a week to pack up her belongings and move because her older brother sold the family residence for $300,000 and "ha[d] kept [Lee] from having any inheritance." (Tr. 498.) Based on Lee's demeanor at the hearing and testimony regarding her activities of daily living, the ALJ concluded that Lee now "ha[d] a stable level of functioning" and that her condition had "returned to baseline." (Tr. 16.) This was a reasonable interpretation. *See Morgan*, 169 F.3d at 599 ("Where the evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld.").

The Court concludes that the ALJ provided specific and legitimate reasons, supported by substantial evidence in the record, for rejecting Dr. Higgins-Lee's opinion.

///

///

///

**B.    Adverse Credibility Determination**

Lee also argues that the ALJ failed to provide legally sufficient reasons for rejecting her subjective symptom testimony. The Court holds that the reasons the ALJ cited were legally sufficient.

Under Ninth Circuit case law, absent a finding of malingering, an ALJ must provide specific, clear and convincing reasons for rejecting a claimant's testimony:

> Without affirmative evidence showing that the claimant is malingering, the [ALJ]'s reasons for rejecting the claimant's testimony must be clear and convincing. If an ALJ finds that a claimant's testimony relating to the intensity of his pain and other limitations is unreliable, the ALJ must make a credibility determination citing the reasons why the testimony is unpersuasive. The ALJ must specifically identify what testimony is credible and what testimony undermines the claimant's complaints.

*Morgan*, 169 F.3d at 597 (citations omitted). Clear and convincing reasons for rejecting a claimant's testimony "include conflicting medical evidence, effective medical treatment, medical noncompliance, inconsistencies in the claimant's testimony or between her testimony and her conduct, daily activities inconsistent with the alleged symptoms, and testimony from physicians and third parties about the nature, severity and effect of the symptoms complained of." *Bowers v. Astrue*, No. 6:11–cv–583–SI, 2012 WL 2401642, at *9 (D. Or. June 25, 2012); *Ramirez v. Comm'r Soc. Sec. Admin.*, No. 09–684–KI, 2010 WL 4683847, at *20 (D. Or. Nov. 10, 2010) (same).

In assessing a claimant's credibility, an ALJ may also consider (1) "ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid," and (2) "unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment[.]" *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996). If the ALJ's credibility

finding is supported by substantial evidence in the record, district courts may not engage in second-guessing. *Thomas*, 278 F.3d at 959.

The ALJ provided specific, clear, and convincing reasons for rejecting Lee's testimony about the extent of her symptoms. One of the clear and convincing reasons the ALJ provided is that Lee worked as a CNA for over a year after the alleged onset of disability. *Cf. Richardson v. Comm'r of Soc. Sec.*, 588 F. App'x 531, 533 (9th Cir. 2014) (holding that the claimant's ability to work part-time after applying for benefits supported the ALJ's adverse credibility determination); *Hubble v. Astrue*, 467 F. App'x 675, 677 (9th Cir. 2012) ("The ALJ reasonably concluded that Hubble's ability to work with similar impairments in the past undermines her claimed inability to work now.").

Lee maintains that her "work activity may affect the determination of the onset of her disability, but it does not indicate that she is lacking in credibility." (Pl.'s Br. at 15.) In support of this assertion, Lee relies on the following excerpt from the Ninth Circuit's decision in *Lingenfelter v. Astrue*, 504 F.3d 1028 (9th Cir. 2007): "It does not follow from the fact that a claimant tried to work for a short period of time and, because of his impairments, *failed*, that he did not then experience pain and limitations severe enough to preclude him from *maintaining* substantial gainful employment." *Id.* at 1038 (emphasis in the original). Unlike here, the claimant in *Lingenfelter* "was fired from [his] job after eight weeks . . . because he was too slow to do the work adequately." *Id.* at 1033. Lee, on the other hand, testified that she voluntarily left her position as a CNA before being terminated. Lee may have been written up for job performance-related issues, but the Court cannot assume that she would have been fired or that she could not continue to work as a result of her impairments. Indeed, Lee testified that she went back to work as a CNA because she "didn't think" that she could "obtain a lawyer" and "continue going on" after the initial denial of benefits, not that

she was unable to work. (Tr. 32.) It was reasonable for the ALJ to conclude that Lee's ability to work as a CNA (semi-skilled work with an SVP of 4) (Tr. 419) while impaired, undermined her claimed inability to work at any job as a result of the same impairments.

The ALJ cited other clear and convincing reasons for discrediting Lee's testimony, including conflicting medical evidence (e.g., the assessments provided by non-examining state agency physicians and psychiatrists), medical noncompliance (continuing to smoke and failing to comply with prescribed diabetes treatment), effective medical treatment, inconsistencies between her testimony and her conduct, and daily activities inconsistent with the alleged symptoms (as discussed above).

Additionally, on the Adult Function Report Lee listed places she went on a regular basis (e.g., church, community center, sports events, social groups). Lee's response indicates that although she goes "fishing at least once a week," she "do[es]n't have a social life." (Tr. 198-99.) However, according to reports Lee made to her treating physicians, "she continues to be 'very catholic'" and "[t]ries to stay busy with her church etc. so she doesn't think about [family and financial stressors]." (Tr. 241, 470.) Moreover, when Lee informed Dr. Schur in February 2007 that she was having difficulty attending church, she attributed it to "work [and] home responsibilities," not physical or mental impairments. (Tr. 241.) These inconsistencies between Lee's statements and her conduct lend further support to the ALJ's adverse credibility determination.

The Court concludes that the ALJ provided several specific, clear, and convincing reasons in support of his adverse credibility determination. Thus, "[t]o the extent that the ALJ may have erred in discrediting [Lee]'s subjective symptom testimony . . . , the error is harmless, because the ALJ cited other clear and convincing reasons for h[is] credibility determination." *Sandoval v.*

Page 30 - FINDINGS AND RECOMMENDATION

*Colvin*, No. 13–0482, 2014 WL 4854565, at *12 (C.D. Cal. Sept. 30, 2014) (citing *Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1162-63 (9th Cir. 2008)).

## C.    Lay Witness Testimony

Lee argues that the ALJ erred by giving only partial consideration to Hicks' lay witness testimony. The Court disagrees.

In determining whether a claimant is disabled, an ALJ is required to consider lay witness testimony concerning a claimant's ability to work. *Bruce v. Astrue*, 557 F.3d 1113, 1115 (9th Cir. 2009). Such testimony is competent evidence that cannot be disregarded without providing specific reasons that are germane to each witness. *Stout v. Comm'r of Soc. Sec. Admin.*, 454 F.3d 1050, 1054 (9th Cir. 2006). "Inconsistency with medical evidence is one such reason." *Bayliss v. Barnhart*, 427 F.3d 1211, 1218 (9th Cir. 2005). "Germane reasons for rejecting a lay witness' testimony [also] include inconsistencies between that testimony and the claimant's presentation to treating physicians or the claimant's activities, and the claimant's failure to participate in prescribed treatment." *Barber v. Astrue*, No. 1:10–cv–01432, 2012 WL 458076, at *21 (E.D. Cal. Feb. 10, 2012).

The ALJ noted that Hicks—Lee's friend, housemate, and former co-worker—testified that Lee "forgets to take her insulin" and that they "go fishing" together. (Tr. 14.) The ALJ went on to state: "After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's and third-party['s] statements concerning the intensity, persistence and limiting effects of these symptoms are not credible." (Tr. 14.) The ALJ supported his conclusion with a thorough summary of the medical opinions and treatment records.

Page 31 - FINDINGS AND RECOMMENDATION

Lee argues that the ALJ's failure to address every detail in Hicks' testimony was error. Lee relies on *Tobeler v. Colvin*, 749 F.3d 830 (9th Cir. 2014), a case concerning the denial of attorney fees under the Equal Access to Justice Act. *Id*. at 832-33. The Ninth Circuit held that the district court abused its discretion by finding the government's position on the plaintiff's fee award substantially justified. *Id*. at 835. In support of their holding, the Ninth Circuit emphasized that "lay witness testimony as to a claimant's symptoms or how an impairment affects ability to work is competent evidence and therefore cannot be disregarded without comment." *Id*. (citation omitted).

*Tobeler* is distinguishable because the ALJ here explicitly found Hicks' lay witness testimony to be not credible, as opposed to disregarding it "without comment." The ALJ supported his conclusion by citing to medical opinions and treatment records that contradicted Hicks' characterization of Lee's symptoms. His failure to address every aspect of Hicks' testimony was not error.

In any event, even if the ALJ erred by failing to explain sufficiently his reasons for disregarding Hicks' lay witness testimony, "this error was harmless because the ALJ provided adequate reasons to reject [Lee]'s own testimony, which was similar to the lay testimony." *Ash v. Colvin*, No. 3:12–cv–02017–RE, 2014 WL 1383943, at *8 (D. Or. Apr. 8, 2014) (citing *Molina v. Astrue*, 674 F.3d 1104, 1121-22 (9th Cir. 2012)); *Corso v. Colvin*, No. 3:13-cv-250-AC, 2014 WL 950029, at *12 (D. Or. Mar. 11, 2014) (citing *Molina* and reaching the same result where ALJ failed to discuss lay witness testimony); *see also Williams v. Astrue*, 493 F. App'x 866, 869 (9th Cir. 2012) ("These errors were harmless in light of our decision in *Valentine*, where we held that when an ALJ provides clear and convincing reasons for rejecting the credibility of a claimant's own subjective complaints, and the lay-witness testimony is similar to the claimant's complaints, it follows that the

ALJ gives 'germane reasons for rejecting' the lay testimony."). The ALJ did not commit harmful error in evaluating Hicks' lay witness testimony.

**D.      Step-Five Determination**

Finally, Lee argues that the Commissioner did not meet her burden of demonstrating that Lee retains the ability to perform "other work" existing in the national economy. Lee's position is predicated on arguments the Court has already rejected above. The Court finds that the Commissioner met her burden at step-five.

## V. CONCLUSION

For the reasons stated above, the Court recommends that the district judge affirm the Commissioner's decision.

## VI. SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge.  Objections, if any, are due fourteen (14) days from service of the Findings and Recommendation.  If no objections are filed, then the Findings and Recommendation will go under advisement on that date.  If objections are filed, then a response is due fourteen (14) days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

Dated this  20th  day of April, 2015.

STACIE F. BECKERMAN
United States Magistrate Judge